## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

ELIZABETH GOMES, EVA M.              )
CONNORS, JENNIFER BOWEN,            )
KATISHA SHOULDERS, KENNETH N.  )
MARENGA, PAMELA PRISCO             )
CARPENTER, STEVEN PETERS,          )     **CIVIL ACTION NO:  _____**
ZHANNA KARP, Individually, and on    )
Behalf of All Others Similarly Situated,   )
                                                          )
             Plaintiffs,                          )
                                                          )
                   v.                                 )
                                                          )
STATE STREET CORPORATION,        )
STATE STREET BANK & TRUST          )
COMPANY, NORTH AMERICA           )
REGIONAL BENEFITS COMMITTEE   )
OF STATE STREET CORPORATION,   )
INVESTMENT COMMITTEE OF          )
STATE STREET CORPORATION, and  )
JANE and JOHN DOES 1-20,              )
                                                          )
             Defendants.                        )

## COMPLAINT

1.      Plaintiffs Elizabeth Gomes, Eva M. Connors, Jennifer Bowen, Katisha Shoulders,

Kenneth N. Marenga, Pamela Prisco Carpenter, Steven Peters, and Zhanna Karp (collectively,

"Plaintiffs"), who are participants in the State Street Salary Savings Program (hereafter, the

"Plan"), individually on behalf of themselves and all others similarly situated, and on behalf

of and for the benefit of the Plan, allege as follows:

## INTRODUCTION

2.      This case is about a company's self-dealing at the expense of its own workers'

retirement savings.  Defendants were required by the Employee Retirement Income Security Act

of 1974, as amended ("ERISA"), 29 U.S.C. §1001 *et seq.*, to act solely in the interest of the Plan's

participants and beneficiaries ("Participants") when making decisions with respect to selecting and monitoring the Plan's investments, and the fees and expenses associated with those investments. Rather than fulfilling these fiduciary duties, among the "highest [duties] known to the law," *Donovan v. Byworth*, 680 F.2d 263, 272 (2d Cir. 1982), by offering Plaintiffs and the other investors in the Plan only prudent investment options at reasonable cost, Defendants selected for the Plan and repeatedly failed to remove or replace imprudent proprietary investment funds ("State Street Funds") managed and offered by Defendant State Street Corporation ("State Street" or "Company") and/or its subsidiaries or affiliates. These funds were not selected and retained as the result of an impartial or prudent process, but were instead selected and retained because Defendants benefited financially from their inclusion in the Plan to the detriment of the Participants. By choosing and then retaining these proprietary investment funds, to the exclusion of alternative investments available in the 401(k)-plan marketplace, Defendants enriched themselves at the expense of their own employees. Defendants also breached their fiduciary duties by failing to monitor the Plan's administrative fees, and likewise failing to consider the prudence of retaining a poorly performing money market fund. Defendants committed further statutory violations by engaging in conflicted transactions expressly prohibited by ERISA.

3.      This is a civil enforcement action under ERISA and, in particular, ERISA §§404, 406, 409, 502(a), 29 U.S.C. §§1104, 1106, 1109, 1132(a). Plaintiffs bring this action on behalf of the Plan and similarly situated Participants for, *inter alia*, losses to the Plan and for disgorgement of unlawful fees and profits.

4.      This class action is brought on behalf of Participants who invested in the Plan from May 25, 2015, through the present ("Relevant Period").

## I.    JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

7.     Venue is proper in this district pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because Defendants' principal place of business is located in this district.

## II.    PARTIES

### Plaintiffs

8.     Plaintiff Elizabeth Gomes is a "participant" in the Plan, within the meaning of ERISA §3(7), 29 U.S.C. §1102(7), and held State Street Funds in her Plan account during the Relevant Period.

9.     Plaintiff Eva M. Connors is a "participant" in the Plan, within the meaning of ERISA §3(7), 29 U.S.C. §1102(7), and held State Street Funds in her Plan account during the Relevant Period.

10.     Plaintiff Jennifer Bowen is a "participant" in the Plan, within the meaning of ERISA §3(7), 29 U.S.C. §1102(7), and held State Street Funds in her Plan account during the Relevant Period.

11.     Plaintiff Katisha Shoulders is a "participant" in the Plan, within the meaning of ERISA §3(7), 29 U.S.C. §1102(7), and held State Street Funds in her Plan account during the Relevant Period.

12.     Plaintiff Kenneth N. Marenga is a "participant" in the Plan, within the meaning of ERISA §3(7), 29 U.S.C. §1102(7), and held State Street Funds in his Plan account during the Relevant Period.

13.     Plaintiff Pamela Prisco Carpenter is a "participant" in the Plan, within the meaning of ERISA §3(7), 29 U.S.C. §1102(7), and held State Street Funds in her Plan account during the Relevant Period.

14.     Plaintiff Steven Peters is a "participant" in the Plan, within the meaning of ERISA §3(7), 29 U.S.C. §1102(7), and held State Street Funds in his Plan account during the Relevant Period.

15.     Plaintiff Zhanna Karp is a "participant" in the Plan, within the meaning of ERISA §3(7), 29 U.S.C. §1102(7), and held State Street Funds in her Plan account during the Relevant Period.

**Defendants**

16.     Defendant State Street, a financial holding company, is both incorporated and maintains its principal place of business in Massachusetts.  State Street is the Plan sponsor. According to the Plan's Summary Plan Description ("SPD"), State Street, acting through, *inter alia*, its directors, committees, and employees is also a fiduciary of the Plan.  Among its other Plan-related responsibilities, the Executive Committee of State Street's Board of Directors ("Board of Directors"), acting for the Company, may appoint and remove members of the North America Regional Benefits Committee ("Benefits Committee"), which is the Plan Administrator.  The Board of Directors is also responsible for overseeing the Plan's Investment Committee ("Investment Committee") and its respective members.  The SPD further provides that the Company has the authority to add or delete the Plan investments at any time.  During the Relevant Period, State Street has had discretionary authority or control over the administration and management of the Plan, and discretionary authority or control over the Plan assets.  ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

17.     Defendant State Street Bank and Trust Company ("State Street Bank") is the principal banking subsidiary of State Street.  State Street Bank is both incorporated and maintains its principal place of business in Massachusetts.  According to the Plan's SPD, State Street Bank is the Plan trustee and a fiduciary of the Plan.  During the Relevant Period, State Street Bank has had discretionary authority or control over the administration and management of the Plan, and discretionary authority or control over the Plan assets.  ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

18.     At all relevant times, Defendant Benefits Committee, through its members, has managed and administered the Plan and has had discretionary authority or control over the assets of the Plan.  ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).  According to the Plan's SPD, the Benefits Committee is the Plan Administrator and a fiduciary of the Plan.  Members of the Benefits Committee are appointed and removed by the Executive Committee of the Board of Directors at its discretion.

19.     At all relevant times, Defendant Investment Committee, through its members, managed and administered the Plan and has had discretionary authority or control over the assets of the Plan.  ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).  According to the Plan's SPD, the Investment Committee is a fiduciary of the Plan.  The Investment Committee is overseen by the Board of Directors.

20.     To the extent there are additional directors, officers, and employees of State Street or State Street Bank, who served as fiduciaries of the Plan during the Relevant Period, including members of the Board of Directors, the Benefits Committee, and/or the Investment Committee, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to add them to the instant action.  Thus, without limitation, unknown

"Jane and John Doe" Defendants 1-20 include other individuals, including, but not limited to, the Company directors, officers, and employees, who served as fiduciaries of the Plan within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A) during the Relevant Period.

## III.    THE PLAN

21.    The Plan is an employee benefit plan within the meaning of ERISA §§3(3) and 3(2)(A), 29 U.S.C. §§1002(3) and 1002(2)(A), and a "defined contribution" plan within the meaning of ERISA §3(34), 29 U.S.C. §1002(34).  The Plan provides for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account.

22.    At all relevant times, Participants were allowed to direct the Plan to purchase investments from only those investment options that were available under the Plan and allocate them to their individual Plan accounts.[1]

23.    At all relevant times, the Plan provided a number of investment options, the vast majority of which, except for one money market fund, were the State Street Funds.  According to the SPD, the State Street Funds are managed by the SSGA Division of the Company.  Further pursuant to the SPD, the Company has the authority to add or delete Plan investments at any time.

24.    According to the SPD, State Street's proprietary target date funds are the default investment options under the Plan, depending on a given Participant's anticipated retirement date.

25.    The Plan covers eligible employees of State Street and its subsidiaries and affiliates.

26.    The Plan had 23,270 Participants as of the end of the 2019 Plan year.

27.    The Plan had total assets valued at approximately $4.493 billion as of December 31, 2019.

---

[1]    These include the Plan's core funds, target date funds, and company stock.  Additionally, the Plan provides a self-managed brokerage account through Fidelity Brokerage Link.

IV.   **DEFENDANTS' VIOLATIONS OF ERISA**

    A.   **DEFENDANTS' PROCESS FOR SELECTING AND MONITORING INVESTMENT OPTIONS WAS IMPRUDENT AND TAINTED BY SELF-INTEREST**

    28.   Pursuant to ERISA, plan fiduciaries, such as Defendants, must (i) discharge their plan-related duties for the exclusive purpose of providing benefits to participants and defraying reasonable expenses of plan administration; (ii) act with the care, skill, prudence, and diligence under the circumstances then prevailing, that a prudent person acting in like capacity and experienced with such matters would use under the circumstances; (iii) diversify plan investments; and (iv) act in accordance with the terms of the plan, in-so-far as those terms comply with the statute.  ERISA §404, 29 U.S.C.§1104.  Notably, fiduciaries are under a continuing duty to monitor plan investments.  *Tibble v. Edison*, 135 S. Ct. 1823, 1829 (2015).  ("This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting [investments]. . . at the outset").

    29.   According to regulatory guidance issued by the U.S. Department of Labor ("DOL"), procedural due diligence undertaken by plan fiduciaries is meant to ensure that plan-related investment decisions are reasonable and in furtherance of the retirement plan's purpose:

> Appropriate consideration shall include, but is not limited to (a) A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action.

29 C.F.R. §2550.404a-1.

    30.   In order to fulfill their ERISA duties and advance the purposes of the plan under their watch, fiduciaries, such as Defendants, should scrutinize each plan investment on a regular basis with appropriate consideration for, *inter alia*, the risk of loss, the opportunity for return,

diversification, current and projected returns, as well as the costs associated with that investment. Fiduciaries should also consider the size and bargaining power of a given plan in the course of their process of investment selection and monitoring.

31.     Here, it matters that the plan at issue, with over $4 billion in assets, is one of the largest defined contribution plans in the nation.  As such, throughout the Relevant Period, the Plan had tremendous bargaining power to obtain superior investments with outstanding performance results at low costs.  In particular, at all relevant times, there have been many non-State Street-branded, reasonably priced, and well-managed investment options in the 401(k)-plan marketplace available to the Plan.  Such options include registered mutual funds, exchange-traded funds, and non-registered commingled funds, such as bank collective or common trusts and insurance company pooled separate accounts.

32.     Yet, in derogation of their ERISA mandated duties, Defendants failed to consider the continued prudence of maintaining the State Street Funds in the Plan during the Relevant Period, despite other 401(k) investors exiting or decreasing their holdings in these funds at the time, and even as the State Street Funds underperformed their benchmarks and generated unreasonable fees, resulting in Plan losses and/or unjust profits for the Company.  Defendants' failure to monitor the continued prudence of retaining State Street's proprietary funds in the Plan is all the more egregious in light of the availability of other non-affiliated investment alternatives with the same investment objectives, that were less risky, less costly, and able to showcase a consistently superior performance record at all relevant times.  There were even less costly shares available of the proprietary funds at issue that other State Street investors were able to invest in, but not the Plan.  Moreover, as a result of the Plan being invested in the State Street Funds,

Participants have also been subjected to the added burden of redemption fees, commissions, and other similar expenses in connection with these investments throughout the Relevant Period.

33.     No one investment management firm is good at everything.  Some investment management firms excel at providing fixed income investment products, others at equity investment products, and still others at international and emerging market investment products. Prudent fiduciaries for large plans understand this fact and accordingly take a "best of breed" approach in assembling menus of retirement plan investment options for their retirement plan investors, carefully and diligently searching among the various vendors in the retirement plan investment product market to construct a suitable and appropriately low-cost and diversified array of investment options.  Russell Investments, *Seven Attributes of an Excellent Defined Contribution Plan*, at 2 (Feb. 2012).[2]

34.     Notably, at least one of Defendants' major fund family competitors outsources its retirement plan's fund selection process to avoid the conflicts of interest that are the gravamen of this case.   (*See*  https://web.archive.org/web/20130118084937/http:/www.investmentnews.com/ article/20130113/REG/301139999) ("For instance, at TD Ameritrade Inc., the company's own 401(k) is run by Great-West Retirement Services, and assets are held by a Great-West affiliate. 'We do get questions from workers who say, "Wouldn't it make sense for us to hold those assets?"' said Skip Schweiss, president of TD Ameritrade Trust Co.  'This keeps us away from potential conflict where we could be earning revenue on employee assets,' he said.") (last viewed May 24, 2021).

---

[2]     Russell Investments is a retirement plan consultant and investment manager.  Its clients include AT&T, Inc., Barclays Bank, Caterpillar, Chrysler Group LLC, Coca-Cola Bottling Co., Delta Airlines, Inc., and Toyota Motor Pension Fund, among others.  (*See* www.russellinvestments.com/us/about-us (last viewed May 24, 2021).

35.     Here, however, Defendants did not consider or act in the best interests of the Plan throughout the Relevant Period.  Instead, Defendants put their own interests before those of the Participants, by using the Plan to generate fees and otherwise promote and develop State Street's investment management business (including using Plan assets as seed money for the newly launched proprietary funds) to the detriment of the Plan.  Indeed, with the exception of one money market fund and a so-called "brokerage window"[3] built into the Plan, Defendants offered Participants as their designated retirement investment options *only* State Street Funds, thus treating Participants as captive investors to prop up the Company's investment management business, while other investors were exiting or decreasing their positions in these funds, and the Company was thereby losing the revenue from non-Plan investment sources.

36.     While an ERISA fiduciary's use of proprietary investment options in its employee 401(k) plan is not a breach of the duty of prudence or loyalty in and of itself, a plan fiduciary's

---

[3]     As the DOL has explained in regulatory guidance, an ERISA-covered retirement plan and its fiduciaries cannot reduce or eliminate their ERISA duty to monitor loyally and prudently retirement plan Designated Investment Alternatives like the State Street Funds at issue in this case simply by opening a so-called "brokerage window" for plan participants featuring an array of investment funds managed by firms other than State Street.   (*See* https://www.dol.gov/ agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2012-02r)        ("Also, fiduciaries of such plans with platforms or brokerage windows, self-directed brokerage accounts, or similar plan arrangements that enable participants and beneficiaries to select investments beyond those designated by the plan are still bound by ERISA section 404(a)'s statutory duties of prudence and loyalty to participants and beneficiaries who use the platform or the brokerage window, self-directed brokerage account, or similar plan arrangement, including taking into account the nature and quality of services provided in connection with the platform or the brokerage window, self-directed brokerage account, or similar plan arrangement.") (last viewed Feb. 10, 2021).  *See also Pfeil v. State Street Bank and Trust Co.*, 671 F.3d 585, 597 (6th Cir. 2012) (overruled on other grounds) ("A fiduciary cannot avoid liability for offering imprudent investments merely by including them alongside a larger menu of prudent investment options. Much as one bad apple spoils the bunch, the fiduciary's designation of a single imprudent investment offered as part of an otherwise prudent menu of investment choices amounts to a breach of fiduciary duty, both the duty to act as a prudent person would in a similar situation with single-minded devotion to the plan participants and beneficiaries, as well as the duty to act for the exclusive purpose of providing benefits to plan participants and beneficiaries.").

process for selecting and monitoring proprietary investments ***is*** subject to the same duties of loyalty and prudence that apply to the selection and monitoring of other investments, and if certain criteria for these investments is not met (especially over a prolonged period of time), fiduciary action must be taken to protect the plan.

37.     As this Court has recently recognized, prudent and unconflicted plan fiduciaries know or should know that no one investment fund family necessarily provides prudent retirement fund options across all asset classes and should thus engage in appropriate due diligence in the course of selecting and monitoring each plan investment, including any proprietary funds. *See, e.g.*, *Baker v. John Hancock Life Ins. Co. (U.S.A.)*, No. 1:20-CV-10397-GAO, 2020 WL 8575183, at *1 (D. Mass. July 23, 2020) (denying motion to dismiss in similar case brought against John Hancock and stating that "[i]n total, ***the long-term retention of a substantial number of underperforming funds at higher than comparable costs gives rise to a plausible inference of an objectively imprudent monitoring process***. That the retained underperforming funds were all proprietary John Hancock funds and that in some cases the plan was one of the last investors propping up a failing fund gives rise to the plausible inference of a subjective motive inconsistent with the plan participants' best interest" by the defendant ERISA plan fiduciaries) (emphasis added).[4]

38.     Given the facts alleged herein, it is implausible that had Defendants acted, individually and collectively, as prudent, diligent fiduciaries, they would have adopted a menu of

---

[4]     *See also Wildman v. Am. Century Servs., LLC*, 237 F. Supp. 3d 902, 912 (W.D. Mo. 2017) (denying motion to dismiss in similar ERISA case and observing that "[e]ven when the complaint does not allege facts showing specifically how the fiduciaries breached their duty through improper decision-making, a claim can survive a motion to dismiss if the court may reasonably infer from what was alleged that the fiduciaries followed a flawed process").

designated investment alternatives for their employees' retirement plan consisting almost exclusively of approximately 17 of State Street's own funds.

39.     Likewise, it is not plausible that Defendants faithfully followed a suitable Investment Policy Statement ("IPS"), outlining the process of diversifying the Plan investments, so as to minimize the risk of large investment losses by the Plan and its Participants.

40.     A fiduciary's failure to follow an appropriate IPS in investment selection and retention for a qualified 401(k) plan is of itself not a freestanding ERISA violation, but it is circumstantial evidence Defendants failed to use a viable policy with respect to the Plan's investments, and thus failed to conduct a prudent due diligence process as required by ERISA.  It is again not plausible that each and every one of the approximately 17 State Street Funds in the Plan was chosen and retained pursuant to a rigorous evaluation, screening, and monitoring process involving, for instance, an appropriately detailed comparison to similar funds offered by competitor investment fund vendors to see how State Street Funds compared to other vendors' funds with respect to costs, fees, performance history, and other relevant metrics.[5]  Rather, the nearly 100% proprietary fund line-up from a single fund family that the Plan featured throughout the Relevant Period is the result of self-dealing and imprudence by Defendants.

41.     As set forth below, the relevant investment performance and fee data, as well as the proprietary nature of the Plan investment selections, all support a strong inference that Defendants

---

[5]     *See, e.g.*,  http://docplayer.net/12249737-The-prudence-standard-affiliated-products-and-services.html ("Thus, to meet the prudent process requirement, fiduciaries must thoroughly investigate the investment options to obtain relevant information and then base their decisions on the information obtained.  This means considering competing funds to determine which fund should be included in the plan's investment line-up.  As explained by the DOL in the preamble to the qualified default investment alternative regulations, '[a] fiduciary must engage in an objective, thorough, and analytical process that involves consideration of the quality *of **competing providers and investment products***, as appropriate.'") (emphasis in original) (citation omitted) (last viewed May 24, 2021).

failed to follow a prudent process in selecting and then monitoring the menu of investment options for Plaintiffs and other Participants who invested in the Plan.  Contrary to their fiduciary duties to act in the Participants' best interests, Defendants' near-exclusive selection and retention of State Street's proprietary funds as Plan investment options during the Relevant Period (despite these funds' poor performance, availability of superior unaffiliated investments with demonstrably better performance records, availability of lower cost shares of the proprietary investments and outflow of other investors from the proprietary funds) indicates that the Defendants' decision-making was tainted by the self-serving purpose of promoting and supporting the Company's own funds, regardless of the detrimental impact of that investment strategy on the employees' retirement savings.

42.    State Street Funds significantly underperformed the relevant benchmarks and comparable funds during the time that they were offered in the Plan.  For example, in 2015, 12 out of 17 (71%) of the State Street Funds at issue were in the bottom half of the annual performance peer group ranking, and nine (in other words, 53%) were in the bottom quartile.  In 2020, those rankings were likewise nine out of 17 (again, 53%).  Representative State Street Funds for that period were in the bottom half of the annual performance peer group ranking, and four of them (24%) were in the bottom quartile.  This quantitative underperformance is set forth in more detail below.

43.    Defendants' failure to establish and implement a prudent monitoring process over the Plan's investments is also indicated by, *inter alia*, the Plan's inaccurate financial reporting.  By way of example, according to the Plan's Form 5500 filed with the DOL for the plan year ending on December 31, 2015 ("2015 Form 5500"), one of the Plan investment options during that year

was the S&P Midcap Index NL [(Non Lending)] Series A fund ("S&P Midcap Index Fund"), with

$260,812.589 in assets under management.  The 2015 Form 5500 further provides that:

> The Plan does not engage directly in securities lending, however the Plan's investment options include funds that participate directly in securities lending.  The securities lending activities within these funds are done with/through an affiliate of State Street.  The Daily Emerging Markets Index Fund and the Vanguard Prime Money Market fund are the only non-lending investment options remaining in the Plan.

Notes to Financial Statements at Section 3 (Investments).  This information is contradicted

elsewhere in the 2015 Form 5500 by the Report of Independent Auditors "Audit Report," which

identifies the S&P Midcap Index Fund as one of the funds in the Securities Lending Series, or

more particularly as the "SSGA S&P Midcap Index Securities Lending Series Fund."  Schedule

H, Line 4i – Schedule of Assets (Held at End of Year).

44.     The Audit Report included in the 2015 Form 5500 was prepared by Ernst & Young

LLP and addressed to the Benefits Committee.  Pursuant to the Audit Report, the auditing

standards in accordance with which the Plan audit was purportedly conducted, "require that [the

auditor] plan and perform the audit to obtain reasonable assurance about whether the financial

statements are free of material misstatement." *Id*.  Prudent fiduciaries would have had a

monitoring process in place through which they would have been able to detect and identify the

above-discussed reporting discrepancy in the Form 5500 filing (between information contained in

Part I of the 2015 Form 5500 concerning the S&P Midcap Index Fund, identifying it as a non-

lending fund, and the information provided in the Audit Report (Audited Financial Statements and

Supplemental Schedule), identifying it as a lending fund).  Prudent fiduciaries would have further

corrected this erroneous information to ensure the Plan's Form 5500 was free of material

misstatements.  Additionally, prudent fiduciaries would have, among other things, properly

supervised their auditor to ensure the information in the Audit Report was accurate and complete. Here, as evidenced by, *inter alia*, the 2015 Form 5500,[6] no such fiduciary oversight was in place.

> **B.    DEFENDANTS MAINTAINED THE PLAN'S INVESTMENT IN PERPETUALLY UNDERPERFORMING STATE STREET TARGET DATE FUNDS WHEN OTHER INVESTMENT VENDORS OFFERED BETTER-PERFORMING TARGET DATE FUNDS, AND EVEN WHILE LESS COSTLY SHARES WERE AVAILABLE**

45.    State Street offers a suite of target date funds to retirement investors like Plaintiffs. Target date funds are designed to provide a model asset allocation based on a given investor's projected retirement date, *i.e.*, the target date.  In particular, these funds rebalance their portfolios to become more conservative as the investor nears retirement.

46.    State Street calls its target date funds Target Retirement Funds.  The Plan's SPD provides that if a Participant does not make an investment election, his or her contributions will be automatically invested in the Target Retirement Fund that corresponds to the Participant's assumed target retirement year based on the Participant's birth date.  As such, a given Target Retirement Fund is the default investment option under the Plan.

47.    State Street offers the following Target Retirement Funds within the Plan: State Street Target Retirement 2020 Securities Lending Series Fund, State Street Target Retirement 2025 Securities Lending Series Fund, State Street Target Retirement 2030 Securities Lending Series Fund, State Street Target Retirement 2035 Securities Lending Series Fund, State Street Target Retirement 2040 Securities Lending Series Fund, State Street Target Retirement 2045 Securities Lending Series Fund, State Street Target Retirement 2050 Securities Lending Series Fund, State Street Target Retirement 2055 Securities Lending Series Fund, State Street Target Retirement 2060 Securities Lending Series Fund, State Street Target Retirement 2065 Securities

---

[6]    The same erroneous information concerning the S&P Midcap Index Fund is contained in the Plan's Form 5500 filed with the DOL for the plan year ending on December 31, 2014, even prior to the start of the Relevant Period.

Lending Series Fund, and the State Street Target Retirement Income Securities Lending Series Fund.  Plaintiff Gomes and Plaintiff Shoulders invested in the State Street Retirement 2045 Securities Lending Series Fund through the Plan during the Relevant Period and were thus harmed as alleged herein.  Plaintiff Bowen and Plaintiff Marenga invested in the State Street Target Retirement 2055 Securities Lending Series Fund through the Plan during the Relevant Period and were thus harmed as alleged herein.  Plaintiff Peters invested in the State Street Target Retirement 2030 Securities Lending Series Fund through the Plan during the Relevant Period and was thus harmed as alleged herein.  Plaintiff Karp invested in the State Street Retirement 2020 Securities Lending Series Fund through the Plan during the Relevant Period and was thus harmed as alleged herein.

48.    The State Street Target Retirement Fund family's asset allocation and glide path models are based substantially on the historical performance of various asset class indices such as the S&P 500, the Barclays Capital Aggregate Bond Index (formerly the Lehman Aggregate Bond Index) and others.

49.    The vast majority of the underlying State Street Funds in which the State Street Target Retirement Funds invest, however, are actively managed funds.  In other words, the actual investments that make up the asset base of the various Target Retirement Funds are not consistent with the ostensible index-oriented model upon which the Target Retirement Funds are based.

50.    Defendants' failure to exercise the level of prudence and loyalty expected under the circumstances (with an "eye single" to the interests of Participants)[7] is best illustrated by contrasting their conduct to that of other, similarly situated fiduciaries.  To wit, a number of State Street's major competitors in the retirement plan investment services business – viz, Charles

---

[7]    *Donovan*, 680 F.2d at 271.

Schwab, JPMorgan, and Great-West, just to name a few – offer their own workers target date funds as designated investment alternatives in their ERISA-covered company 401(k) plans that feature non-proprietary index funds as the underlying asset base of those target date funds – and this, again, is despite that Schwab, JPMorgan and Great-West offer their own index fund products and/or services in the marketplace to retirement plan investors such as their own workers.

51.     From the beginning, this use in the Plan of actively managed underlying investments as the asset base of the Plan's chosen target date fund series (which is ostensibly focused on index investing) should have raised concerns for the Plan's fiduciaries.

52.     It was further imprudent for Defendants to select and retain any investment options for the Plan, including target date funds, that lacked a part of, let alone all of, the relevant performance history.  When making investment decisions, prudent fiduciaries of 401(k) plans, such as the Plan, should consider, among other things, the performance history, portfolio manager experience, and manager tenure of available investment alternatives.  A consistent performance history and investment strategy, among other factors, indicate the ability of the investment manager to generate investment results that consistently meet or exceed a given fund's benchmark(s).

53.     The chart below confirms that the State Street Target Retirement Funds in the Plan have routinely turned in far worse returns than their major peers because, *inter alia*, State Street put much more of its employees' target date fund monies into the actively managed proprietary State Street funds that perform worse and are riskier than the passively managed alternatives used by State Street's competitors for their respective 401(k) plans.  As a result, State Street's Target Retirement Funds (for which performance histories are available) have uniformly performed below their relevant benchmarks – which are State Street's self-chosen benchmarks, measured over five-

and ten-year periods (according to the February 2021 Participant Fee Disclosure Statement for the Plan). Notably, one of the State Street Target Retirement Funds does not have a ten-year performance history, another does not have a five or a ten-year performance history, and still another does not have a one year, five year, or ten-year performance history. The below chart also illustrates that State Street offered different share classes of their Target Retirement Funds to other investors that performed better than the Target Retirement Funds that State Street offered Plaintiffs and other Participants in State Street's own Plan. These funds also underperformed the State Street-supplied benchmarks per the February 2021 Participant Fee Disclosure Statement.

| Balance in fund at end of 2019 | Name of proprietary fund | Fund Management Expense | Operating Expense | Fund total fee % | Performance as of 12/31/2020 | | | Inception Date |
|---|---|---|---|---|---|---|---|---|
| | | | | | 1 | 5 | 10 | |
| $22,669,243 | State Street Target Retirement Income Securities Lending Series Fund | 0.055 | 0.01 | 0.065 | 9.95 | 6.79 | 5.53 | 2006 |
| Benchmark | S&P 500 Index | | | | 18.40 | 15.22 | 13.88 | |
| Other SSGA Option | State Street Target Retirement Income Fund - Class I | | | | 10.01 | 6.88 | 5.64 | |
| $80,253,427 | State Street Target Retirement 2020 Securities Lending Series Fund | 0.055 | 0.01 | 0.065 | 11.12 | 8.59 | 7.92 | 2006 |
| Benchmark | S&P 500 Index | | | | 18.40 | 15.22 | 13.88 | |
| Other SSGA Option | State Street Target Retirement 2020 Fund - Class A | | | | 11.24 | 8.68 | 8.03 | |
| $181,654,364 | State Street Target Retirement 2025 Securities Lending Series Fund | 0.055 | 0.01 | 0.065 | 14.94 | 10.32 | 9.01 | 2006 |
| Benchmark | S&P 500 Index | | | | 18.40 | 15.22 | 13.88 | |
| Other SSGA Option | State Street Target Retirement 2025 Fund - Class A | | | | 15.17 | 10.43 | 9.13 | |
| $215,999,136 | State Street Target Retirement 2030 Securities Lending Series Fund | 0.055 | 0.01 | 0.065 | 17.64 | 11.33 | 9.64 | 2006 |
| Benchmark | S&P 500 Index | | | | 18.40 | 15.22 | 13.88 | |
| Other SSGA Option | State Street Target Retirement 2030 Fund - Class A | | | | 17.65 | 11.40 | 9.73 | |
| $233,942,674 | State Street Target Retirement 2035 Securities Lending Series Fund | 0.055 | 0.01 | 0.065 | 18.49 | 11.87 | 9.88 | 2006 |
| Benchmark | S&P 500 Index | | | | 18.40 | 15.22 | 13.88 | |
| Other SSGA Option | State Street Target Retirement 2035 Fund - Class I | | | | 18.56 | 11.97 | 9.99 | |
| $206,793,631 | SSgA Target Retirement 2040 Securities Lending Series Fund | 0.055 | 0.01 | 0.065 | 19.05 | 12.30 | 10.08 | 2006 |
| Benchmark | S&P 500 Index | | | | 18.40 | 15.22 | 13.88 | |
| Other SSGA Option | State Street Target Retirement 2040 Fund - Class I | | | | 19.12 | 12.40 | 10.20 | |
| $166,988,580 | SSgA Target Retirement 2045 Securities Lending Series Fund | 0.055 | 0.01 | 0.065 | 19.52 | 12.65 | 10.25 | 2006 |
| Benchmark | S&P 500 Index | | | | 18.40 | 15.22 | 13.88 | |
| Other SSGA Option | State Street Target Retirement 2045 Fund - Class A | | | | 19.58 | 12.72 | 19.58 | |
| $119,955,670 | SSgA Target Retirement 2050 Securities Lending Series Fund | 0.055 | 0.01 | 0.065 | 19.96 | 12.74 | 10.30 | 2007 |
| Benchmark | S&P 500 Index | | | | 18.40 | 15.22 | 13.88 | |
| Other SSGA Option | State Street Target Retirement 2050 Fund - Class I | | | | 20.03 | 12.85 | 10.41 | |
| $48,423,887 | SSgA Target Retirement 2055 Securities Lending Series Fund | 0.055 | 0.01 | 0.065 | 12.39 | 10.53 | --- | 2011 |
| Benchmark | S&P 500 Index | | | | 18.40 | 15.22 | 13.88 | |
| Other SSGA Option | State Street Target Retirement 2055 Fund - Class I | | | | 19.99 | 12.84 | --- | |
| $12,065,382 | SSgA Target Retirement 2060 Securities Lending Series Fund | 0.055 | 0.01 | 0.065 | 19.92 | --- | --- | 2016 |
| Benchmark | S&P 500 Index | | | | 18.40 | 15.22 | 13.88 | |
| | SSgA Target Retirement 2065 Securities Lending Series Fund | 0.055 | 0.01 | 0.065 | --- | --- | --- | 2020 |
| Benchmark | S&P 500 Index | | | | 18.40 | 15.22 | 13.88 | |
| $1,288,745,994 | Total assets in State Street Target Date Funds | | | | | | | |

54.     A prudent fiduciary, among other things, would have removed any State Street Target Retirement Fund after four consecutive calendar quarters of underperformance.  Here, all State Street Target Retirement Funds underperformed their respective benchmarks for more than four consecutive calendar quarters.  Leading money managers advise that decision makers should consider ten-year periods prior to investing (*see, e.g.*, www.americanfunds.com/pdf/endowments/

rp-034_select.pdf (last viewed May 24, 2021)), yet Defendants did not require so much as a one-year track record when it came to investing the Plan's retirement monies in proprietary State Street funds. *See also Turner v. Schneider Elec. Holdings, Inc.*, No. 20-11006-NMG, 2021 WL 1178308, at *3 (D. Mass. Mar. 26, 2021) (denying motion to dismiss ERISA case concerning 401(k) plan investment options and noting "plaintiffs assert that the selection of the [investments at issue] was imprudent because, at the time they were selected, the funds had insufficient performance histories upon which they could be evaluated. Plaintiffs declare that a prudent fiduciary would not have selected investment options that completely lack performance histories, such as the [investments at issue]").

55.     Instead of abiding by their fiduciary mandate, throughout the Relevant Period, Defendants kept the Plan and its Participants invested in the poorly performing State Street Target Retirement Funds to serve the Company's corporate interests, all the while other 401(k) investors were exiting these funds or decreasing their holdings in these funds. By way of example, each of the following State Street Target Retirement Funds had fewer companies maintaining their plan assets in that fund in 2019, than at the beginning of the Relevant Period:

| State Street Target Retirement Fund | 2015[8] | 2019[9] |
| --- | --- | --- |
| Target Retirement Income Securities Lending Series Fund | 8 | 7 |
| Target Retirement 2015 Securities Lending Series Fund | 8 | 6 |
| Target Retirement 2020 Securities Lending Series Fund | 8 | 7 |
| Target Retirement 2025 Securities Lending Series Fund | 9 | 6 |

[8]     The numbers in this column represent the number of companies invested in the given fund through their respective 401(k) plans in 2015, the beginning of the Relevant Period.

[9]     The numbers in this column represent the number of companies invested in the given fund through their respective 401(k) plans in 2019.

| State Street Target Retirement Fund | 2015[8] | 2019[9] |
|---|---|---|
| Target Retirement 2030 Securities Lending Series Fund | 8 | 7 |
| Target Retirement 2035 Securities Lending Series Fund | 8 | 6 |
| Target Retirement 2040 Securities Lending Series Fund | 8 | 7 |
| Target Retirement 2045 Securities Lending Series Fund | 9 | 6 |
| Target Retirement 2050 Securities Lending Series Fund | 8 | 7 |
| Target Retirement 2055 Securities Lending Series Fund | 8 | 6 |

56.     Not only did Defendants keep the Plan invested in the underperforming State Street Target Retirement Funds, while other fiduciaries were removing their plan investments from these very same funds, but as the below chart further indicates, the amount of Plan assets held in these imprudent investments actually increased during the Relevant Period to the Participants' detriment, as Defendants stood idly by, without taking any protective fiduciary action.

| State Street Target Retirement Fund | 2015[10] | 2019[11] |
|---|---|---|
| Target Retirement Income Securities Lending Series Fund | 8% | 13% |
| Target Retirement 2015 Securities Lending Series Fund | 0% | 10% |
| Target Retirement 2020 Securities Lending Series Fund | 9% | 18% |
| Target Retirement 2025 Securities Lending Series Fund | 11% | 21% |
| Target Retirement 2030 Securities Lending Series Fund | 15% | 32% |
| Target Retirement 2035 Securities Lending Series Fund | 15% | 32% |

---

[10]     The number in this column represents the percentage (%) of Plan assets invested in the given fund in 2015, the beginning of the Relevant Period.

[11]     The number in this column represents the percentage (%) of Plan assets invested in the given fund in 2019.

| State Street Target Retirement Fund | 2015[10] | 2019[11] |
|---|---|---|
| Target Retirement 2040 Securities Lending Series Fund | 19% | 45% |
| Target Retirement 2045 Securities Lending Series Fund | 19.6% | 38.9% |
| Target Retirement 2050 Securities Lending Series Fund | 20% | 37% |
| Target Retirement 2055 Securities Lending Series Fund | 15% | 30% |

57.     As the above charts indicate, instead of closely monitoring the Plan investments to make sure they continued to be prudent at all relevant times, Defendants disloyally kept the Plan invested in the persistently underperforming State Street Target Retirement Funds and even allowed the Plan to increase its position in these imprudent holdings during the Relevant Period, to bolster the Company's revenue from its investment management business, even while other plans were exiting these funds.

58.     All this time, while Defendants' fiduciary breaches were ongoing during the Relevant Period, there were numerous superior alternatives available to the Plan that consistently outperformed the State Street Target Retirement Funds.  The below charts indicate, by way of example, such alternative target date funds:

**2020**

| Fund Name | Compounded | Annualized |
|---|---|---|
| | Performance 2015-2020 | Performance |
| State Street Target Retirement 2020 Securities Lending Series Fund | 50.55% | 7.06% |
| | | |
| Vanguard Target Retirement 2020 | 53.07% | 7.35% |
| State Street Underperformance | -2.52% | -0.30% |
| | | |
| T. Rowe Price Target 2020 | 59.18% | 8.06% |
| State Street Underperformance | -8.64% | -1.00% |
| | | |
| American Fund 2020 | 51.09% | 7.12% |
| State Street Underperformance | -0.54% | -0.06% |

**2025**

| Fund Name | Compounded | Annualized |
|---|---|---|
| | Performance 2015-2020 | Performance |
| State Street Target Retirement 2025 Securities Lending Series Fund | 61.66% | 8.33% |
| | | |
| Vanguard Target Retirement 2025 | 58.85% | 8.02% |
| State Street Underperformance (over) | 2.81% | 0.32% |
| | | |
| T. Rowe Price Target 2025 | 64.57% | 8.66% |
| State Street Underperformance | -2.91% | -0.32% |
| | | |
| American Fund 2025 | 60.33% | 8.19% |
| State Street Underperformance (over) | 1.33% | 0.15% |

**2030**

| Fund Name | Compounded Performance | Annualized Performance |
|---|---|---|
| State Street Target Retirement 2030 Securities Lending Series Fund | 69.11% | 9.15% |
| | | |
| Vanguard Target Retirement 2030 | 63.13% | 8.50% |
| State Street Underperformance (over) | 5.98% | 0.65% |
| | | |
| T. Rowe Price Target 2030 | 66.06% | 8.82% |
| State Street Underperformance (over) | 3.05% | 0.33% |
| | | |
| American Fund 2030 | 69.77% | 9.22% |
| State Street Underperformance | -0.67% | -0.07% |

**2035**

| Fund Name | Compounded Performance | Annualized Performance |
|---|---|---|
| State Street Target Retirement 2035 Securities Lending Series Fund | 72.93% | 9.56% |
| | | |
| Vanguard Target Retirement 2035 | 67.19% | 8.94% |
| State Street Underperformance (over) | 5.74% | 0.61% |
| | | |
| T. Rowe Price Target 2035 | 70.48% | 9.30% |
| State Street Underperformance (over) | 2.46% | 0.26% |
| | | |
| American Fund 2035 | 80.79% | 10.37% |
| State Street Underperformance | -7.85% | -0.81% |

**2040**

| Fund Name | Compounded Performance | Annualized Performance |
|---|---|---|
| State Street Target Retirement 2040 Securities Lending Series Fund | 75.86% | 9.87% |
| | | |
| Vanguard Target Retirement 2040 | 71.13% | 9.37% |
| State Street Underperformance (over) | 4.72% | 0.50% |
| | | |
| T. Rowe Price Target 2040 | 79.58% | 10.25% |
| State Street Underperformance | -3.72% | -0.38% |
| | | |
| American Fund 2040 | 85.25% | 10.82% |
| State Street Underperformance | -9.39% | -0.96% |

**2045**

| Fund Name | Compounded Performance | Annualized Performance |
|---|---|---|
| State Street Target Retirement 2045 Securities Lending Series Fund | 78.42% | 10.13% |
| | | |
| Vanguard Target Retirement 2045 | 74.18% | 9.69% |
| State Street Underperformance (over) | 4.25% | 0.44% |
| | | |
| T. Rowe Price Target 2045 | 81.60% | 10.45% |
| State Street Underperformance | -3.18% | -0.32% |
| | | |
| American Fund 2045 | 87.27% | 11.02% |
| State Street Underperformance | -8.85% | -0.89% |

**2050**

| Fund Name | Compounded Performance | Annualized Performance |
|---|---|---|
| State Street Target Retirement 2050 Securities Lending Series Fund | 78.58% | 10.15% |
| | | |
| Vanguard Target Retirement 2050 | 74.99% | 9.77% |
| State Street Underperformance (over) | 3.59% | 0.37% |
| | | |
| T. Rowe Price Target 2050 | 81.56% | 10.45% |
| State Street Underperformance | -2.98% | -0.30% |
| | | |
| American Fund 2050 | 88.44% | 11.14% |
| State Street Underperformance | -9.86% | -0.99% |

**2055**

| Fund Name | Compounded Performance | Annualized Performance |
|---|---|---|
| State Street Target Retirement 2055 Securities Lending Series Fund | 79.07% | 10.20% |
| | | |
| Vanguard Target Retirement 2055 | 74.81% | 9.76% |
| State Street Underperformance (over) | 4.26% | 0.44% |
| | | |
| T. Rowe Price Target 2055 | 81.32% | 10.43% |
| State Street Underperformance | -2.26% | -0.23% |
| | | |
| American Fund 2055 | 88.31% | 11.12% |
| State Street Underperformance | -9.24% | -0.93% |

**2060**

| Fund Name | Compounded Performance | Annualized Performance |
|---|---|---|
| State Street Target Retirement 2060 Securities Lending Series Fund | 78.60% | 10.15% |
| | | |
| Vanguard Target Retirement 2060 | 73.91% | 9.66% |
| State Street Underperformance (over) | 4.69% | 0.49% |
| | | |
| T. Rowe Price Target 2060 | 81.13% | 10.41% |
| State Street Underperformance | -2.53% | -0.26% |
| | | |
| American Fund 2060 | 88.27% | 11.12% |
| State Street Underperformance | -9.67% | -0.97% |

59.     As such, during the Relevant Period, Defendants had a number of substantially identical, yet cheaper, non-proprietary target date fund alternatives to choose from for the Plan's investment menu.  If Defendants had an appropriate fiduciary process in place here, they would have made different investment choices for the Plan, that would not have resulted in undue losses and unjust profits.

60.     A still further indication of Defendants' lack of a prudent fiduciary process, was Defendants' failure to monitor the Plan's investments options to ensure that the Plan was invested in the least expensive available share class.  Despite the fact that lower-cost shares of the State Street Target Retirement Funds were available to the Plan during the Relevant Period, Defendants imprudently and disloyally selected and retained higher-cost shares of these funds.  Because the only difference between the share classes is the amount of fees, selecting higher-cost shares has resulted in the Plan paying unnecessary fees.  This decision alone caused Participants to lose

millions in retirement savings in unneeded expenses stemming from the Plan's investments in the

State Street Target Retirement Funds.

61.     For instance, each of the following State Street Target Retirement Funds could have

been offered to Participants via lower cost shares:

| State Street Target Retirement Fund | Expense Ratio | Cheaper Share Class | Expense Ratio |
|---|---|---|---|
| Target Retirement Income Securities Lending Series Fund | 0.065% | Target Retirement Income Fund Class I | 0.010% |
| Target Retirement 2015 Securities Lending Series Fund | 0.065% | Target Retirement 2015 Securities Lending Series Fund Class I | 0.010% |
| Target Retirement 2020 Securities Lending Series Fund | 0.065% | Target Retirement 2020 Securities Lending Series Fund Class I | 0.010% |
| Target Retirement 2025 Securities Lending Series Fund | 0.065% | Target Retirement 2025 Securities Lending Series Fund Class I | 0.010% |
| Target Retirement 2030 Securities Lending Series Fund | 0.065% | Target Retirement 2030 Securities Lending Series Fund Class I | 0.010% |
| Target Retirement 2035 Securities Lending Series Fund | 0.065% | Target Retirement 2035 Securities Lending Series Fund Class I | 0.010% |
| Target Retirement 2040 Securities Lending Series Fund | 0.065% | Target Retirement 2040 Securities Lending Series Fund Class I | 0.010% |
| Target Retirement 2045 Securities Lending Series Fund | 0.065% | Target Retirement 2045 Securities Lending Series Fund Class I | 0.010% |
| Target Retirement 2050 Securities Lending Series Fund | 0.065% | Target Retirement 2050 Securities Lending Series Fund Class I | 0.010% |
| Target Retirement 2055 Securities Lending Series Fund | 0.065% | Target Retirement 2055 Securities Lending Series Fund Class I | 0.010% |
| Target Retirement 2060 Securities Lending Series Fund | 0.065% | Target Retirement 2060 Securities Lending Series Fund Class I | 0.010% |
| Target Retirement 2065 Securities Lending Series Fund | 0.065% | Target Retirement 2065 Securities Lending Series Fund Class I | 0.010% |

62.     Exacerbating Defendants' imprudent and conflicted decision to select and retain State Street Target Retirement Funds is the fact that Defendants also chose these funds to serve as the Plan's Qualified Default Investment Alternative ("QDIA").  A 401(k) plan, such as the Plan, can designate one of its investment options as a QDIA to aid participants in the allocation of their retirement holdings.  In the event that plan participants do not direct how their assets should be allocated, all contributions to their plan accounts will be automatically invested in the QDIA. ERISA fiduciaries must make a prudent and loyal selection and, following that, retention of an appropriate QDIA for a given 401(k) plan.  Here, as alleged above, the State Street Target Retirement Fund with the target year that is closest to a given Participant's anticipated retirement age serves as the Plan's QDIA, making the impact of Defendants' imprudent and disloyal selection of the State Street Target Retirement Funds particularly egregious.

63.     Based on the foregoing, a prudent fiduciary in like circumstances would have made a different decision in selecting a target date suite of investment options for the Plan.  Here, Defendants breached their duties of prudence and loyalty by selecting and maintaining the State Street Target Retirement Funds as the Plan's default investment options despite numerous deficiencies that were evident during the Relevant Period, including these funds' unduly risky profile, partially or wholly lacking performance histories, continued failure to meet their designated benchmarks and outflow of non-Plan investments from these funds, when superior alternatives that were less risky and better performing were available in the marketplace at the same or lesser cost.

**C.     DEFENDANTS MAINTAINED THE PLAN'S INVESTMENT IN OTHER POORLY PERFORMING STATE STREET FUNDS WHEN OTHER INVESTMENT VENDORS OFFERED LOWER-FEE AND BETTER-PERFORMING INDEX FUNDS**

64.     Putting aside the target date fund series, Defendants also chose for the Plan to offer and retain only State Street-branded proprietary index funds.  Per the below chart and much as

with State Street's target date fund series, these State Street index funds have been poor performers, which for the most part, trail their self-identified performance benchmarks.

| Balance in fund at end of 2019 | Name of proprietary fund | Fund Management Expense | Operating Expense | Fund total fee % | Performance as of 12/31/2020 | | | Inception Date |
|---|---|---|---|---|---|---|---|---|
| | | | | | 1 | 5 | 10 | |
| | Other Proprietary Investments in 401(k) Plan | | | | | | | |
| $285,203,283 | SSgA Daily EAFE Index Securities Lending Fund | | | 0.130 | 18.32 | 12.98 | 3.64 | 2003 |
| Benchmark | MSCI Emerging Markets | | | | 18.69 | 13.22 | 4.00 | |
| $103,017,591 | SSGA Emerging Markets Index Lending Series Fund (International) | 0.025 | 0.05 | 0.075 | 18.19 | 12.73 | 3.81 | 2008 |
| Benchmark | MSCI Emerging Markets (G) | | | | 18.69 | 13.22 | 4.00 | |
| $191,503,383 | SSGA Passive Bond Market Index SL SF | 0.012 | 0.008 | 0.020 | 7.67 | 4.44 | 3.81 | 1994 |
| Benchmark | BBgBarc U.S Agg Bond | | | | 7.51 | 4.44 | 3.84 | |
| $619,950,408 | SSGA Russell Small/Mid Cap Index SL SF (Mid-Cap) | 0.02 | 0.012 | | 32.73 | --- | --- | 2016 |
| Benchmark | RS Small Cap Completeness | | | | 32.88 | | | |
| $1,255,272,327 | SSGA S&P 500 SL SF (Large Cap) | 0.007 | 0.003 | 0.010 | 18.36 | 15.18 | 13.83 | 2000 |
| Benchmark | S&P 500 | | | | 18.40 | 15.22 | 13.88 | |
| $21,337,128 | SSGA World Government Bond Ex-US Index Non-Lending Fund-Pass | 0.04 | 0.02 | 0.060 | 10.70 | --- | --- | 2008 |
| Benchmark | FTSE Non-US Wrld Gov Bond | | | | 10.78 | | | |
| $2,476,284,120 | Total Assets in other State Street Funds | | | | | | | |
| $3,765,030,114 | Total Plan Assets in State Street Funds | | | | | | | |

65.     Had an appropriate fiduciary process been in place during the Relevant Period, the outcome for the Plan here would have been different.  The deficiency of State Street's proprietary index funds should have been evident to Defendants throughout the Relevant Period if a proper review of these funds' performance record had been conducted on a regular basis, as shown by the chart above.   Specifically, a prudent and unconflicted ERISA fiduciary would have taken corrective steps to monitor and remove such poorly performing funds from the Plan or replace them with investment options that demonstrated an ability to consistently meet or outperform their benchmark(s) at the time that fiduciary decisions should have been made to protect the Plan. Defendants, however, did not do this.  This, too, harmed Plaintiffs and the other Participants, and supports a strong inference that Defendants failed to follow a prudent process in selecting and maintaining these and the Plan's other investments.  Plaintiffs Gomes, Connors, Karp, Peters, and

Prisco Carpenter invested in State Street's index funds through the Plan during the Relevant Period and were thus harmed as alleged herein.

66.     As with State Street's target date funds, throughout the Relevant Period, Defendants kept the Plan and its Participants invested in the Company's underperforming index funds, once again to benefit the Company's corporate interests (instead of looking out for Participants' interests), all the while other 401(k) investors were exiting these funds.  By way of example, each of the following State Street proprietary index funds had fewer companies maintaining their plan assets in that fund in 2019, than at the beginning of the Relevant Period:

| Proprietary Fund Name | 2015[12] | 2019[13] |
|---|---|---|
| SSGA EAFE Index Securities Lending Series Fund | 17 | 13 |
| SSGA Emerging Markets Index Non Lending Series Fund | 21 | 19 |
| SSGA Passive Bond Market Index SL | 13 | 11 |
| SSGA Russell Small Mid Cap Index SL SF | 21 | 12 |

67.     Similarly, as with the Company's target date funds, not only did Defendants keep the Plan invested in the underperforming State Street proprietary index funds, while other fiduciaries were removing their plan investments from these funds, but once again, Defendants remained idle, failing to undertake protective fiduciary action, as the amount of Plan assets held in these imprudent investments increased during the Relevant Period.  For instance, the amount of Plan assets invested in the SSGA EAFE Index Securities Lending Series Fund increased from 8% in 2015 (the beginning of the Relevant Period) to 20% in 2019.  Likewise, the amount of Plan

---

[12]     The numbers in this column represent the number of companies invested in the given fund through their respective 401(k) plans in 2015, the beginning of the Relevant Period.

[13]     The numbers in this column represent the number of companies invested in the given fund through their respective 401(k) plans in 2019.

assets invested in the SSGA Russell Small Mid Cap Index SL SF jumped from 0% in 2015 to 50% in 2019. Furthermore, the Plan was the only 100% investor in State Street's SSGA World Government Bond Ex-US Index Lending Fund during the Relevant Period prior to its belated closure.

68. Much as with the Company's target date funds, instead of closely monitoring the Plan's index fund investments to make sure they continued to be prudent at all relevant times, Defendants disloyally kept the Plan invested in the underperforming proprietary index funds and allowed the Plan to increase its position in these imprudent holdings during the Relevant Period, to bolster the Company's revenue from its investment management business, even while other retirement plans were exiting these funds. A prudent fiduciary in like circumstances would have made a different decision in selecting index fund investments for its retirement plan, when better performing analogous investments were available at the same or lesser cost.

69. All this time, while Defendants' fiduciary breaches were ongoing during the Relevant Period, there were numerous superior alternatives available to the Plan that consistently outperformed State Street's proprietary index funds. The below charts indicate, by way of example, such alternative index funds:

**SS S&P 500 Index**

| Fund Name | 5-year performance (as of 12/31/20) |
|---|---|
| **State Street S&P 500 Index Securities Lending Fund** | **15.18%** |
| | |
| **Vanguard 500 Admiral** | **17.26%** |
| **State Street Underperformance** | **-2.08%** |
| | |
| **Fidelity 500 Index** | **17.28%** |
| **State Street Underperformance** | **-2.10%** |

**SS Emerging Markets Index**

| Fund Name | 5-year performance (as of 12/31/20) |
|---|---|
| State Street Emerging Markets Index Securities Lending Fund | 12.73% |
| JPMCB Global Emerging Markets Opportunity Fund | 15.76% |
| State Street Underperformance | -3.03% |
| BlackRock Emerging Markets Fund | 16.76% |
| State Street Underperformance | -4.03% |

**SS Russell Small/Mid Cap**

| Fund Name | 1-year performance (SS Date of Inception 2016) |
|---|---|
| State Street Russell Small/Mid Cap Index Securities Lending Series Fund | 32.73% |
| BNY Melon Small/Mid Cap Growth | 68.49% |
| State Street Underperformance | -35.76% |
| T Rowe Price New Horizons | 57.72% |
| State Street Underperformance | -24.99% |

70.     As such, during the Relevant Period, Defendants had a number of substantially identical, yet cheaper, non-proprietary index fund alternatives to choose from for the Plan's investment menu.  If Defendants had an appropriate fiduciary process in place, as is required for non-conflicted fiduciaries to satisfy their duties of prudence and loyalty, they would have made different investment choices for the Plan, that would not have resulted in undue losses and unjust profits.

**D.    DEFENDANTS FAILED TO CONSIDER THE CONTINUED PRUDENCE OF MAINTAINING THE PLAN'S POORLY PERFORMING MONEY MARKET FUND IN THE PLAN AT ANY TIME DURING THE RELEVANT PERIOD**

71.    In fact, the only non-proprietary retirement investment option Defendants offered Plaintiffs and the other Participants through the Plan[14] is the Vanguard Money Market Fund ("Money Market Fund").  Yet even this fund has not been a suitable investment for the Plan during the Relevant Period because of its continuously poor track record.  Specifically, the Money Market Fund has fallen well below its designated benchmark in its one-year, five-year, and ten-year performance history.  Given this dismal performance record, it is evident that Defendants failed to consider the continued prudence of retaining the Money Market Fund in the Plan at any time during the Relevant Period, let alone replace it with a better performing and cost-efficient alternative in furtherance of the Participants' interests.  A prudent fiduciary here, among other things, would have removed the Money Market Fund after four consecutive calendar quarters of underperformance.  In the least, the Money Market Fund should have been placed on a fund watch list for further evaluation during the Relevant Period and then removed and/or replaced with a suitable alternative that has shown an ability to consistently meet or outperform the relevant benchmark(s), in line with the Plan's purpose of helping Participants save for their retirement.

| Balance in fund at end of 2019 | Name of proprietary fund | Fund Management Expense | Operating Expense | Fund total fee % | Performance as of 12/31/2020 | | | Inception Date |
|---|---|---|---|---|---|---|---|---|
| | | | | | 1 | 5 | 10 | |
| | Non-Proprietary Investments in 401(k) Plan | | | | | | | |
| | | | | | | | | |
| $247,733,605 | Vanguard Federal Money Market Fund | 0.11 | 0 | 0.110 | 0.13 | 1.08 | 0.55 | 2008 |
| | Benchmark Barclay US Agg | | | | 3.87 | 3.27 | 3.41 | |
| Other Vanguard Option | Vanguard Retirement Savings Trust - CFE | | | 0.450 | 2.06 | 2.02 | 2.09 | 1989 |

---

[14]    Aside from the nominal exception of the "brokerage window" discussed *supra*, that is.

72.     Moreover, in the wake of certain reforms implemented by the Securities and Exchange Commission in October of 2016 with regard to money market funds ("Money Market Reform of 2016"), institutional investors, such as the Plan, were faced with increased risks or lower yields on their short-term money offerings.[15]  Accordingly, following the Money Market Reform of 2016, many retirement plans have removed the money market fund offerings from their investment menus and replaced them with stable value options.  Here, for instance, Vanguard offers the Vanguard Retirement Savings Trust Collective Investment Trust Stable Value Fund. This fund performed four times better than its benchmark and the Money Market Fund in one, five, and ten-year periods per the table above.  Yet despite the availability of such other better performing and low-cost investment options to the Plan, and despite the implementation of the Money Market Reform of 2016, Defendants failed even to consider or evaluate the continued prudence of maintaining the Money Market Fund in the Plan during the Relevant Period, wholly disregarding the fund's repeated failure to meet its designated benchmark, or other risks and deficiencies posed to the Plan by this investment.

### E.     DEFENDANTS FAILED TO MONITOR AND NEGOTIATE THE PLAN'S ADMINISTRATIVE COSTS

73.     Defendants have also breached their duty to monitor the Plan's administrative costs, including the recordkeeping expenses, and to ensure that these costs were reasonable and prudent, and not the result of disloyal decision-making.  Among other things, on information and belief, Defendants failed to conduct an appropriately competitive bidding process during the Relevant Period, thereby keeping the Plan's administrative fees well above those charged to comparable plans, in order to, *inter alia*, profit from the direct or indirect fees paid by the Participants to the

---

[15]     *4 Factors to Know About the Money Market Reform of 2016*, Investopedia (Aug. 25, 2020) (https://www.investopedia.com/articles/investing/042116/4-factors-know-about-money-market-reform-2016-fii-bac.asp).

Company, as well as from a host of undisclosed redemption fees, sales commissions, and other similar expenses in connection with transactions associated with the Plan's investment options.

74.     "Recordkeeping" is a catchall term for the suite of administrative services typically provided to a 401(k) plan, such as the Plan.  The recordkeeping market is highly competitive and lucrative, with many vendors equally capable of providing recordkeeping services to 401(k) plans and vying to procure such business.  According to PlanSponsor's 2019 Recordkeeping Survey, 401(k) recordkeepers hold $4.9 trillion of Americans' retirement savings on their platforms.

75.     As such, 401(k) plans can customize the package of administrative services they obtain and have the services priced accordingly, in the best interests of a particular plan and its participants.  According to a study conducted by the Department of Labor, 401(k) plans featuring a large number of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.[16]  Relatedly, as plan asset size increases, the costs per participant should decrease.[17]  Recordkeeping fees for jumbo plans, such as the Plan, have also declined significantly in recent years, as a result of, *inter alia*, advances in technology, strong market competition, and increased attention to fees by fiduciaries of other 401(k) plans, such that the fees that may have been reasonable at one time, may have become excessive based on prevailing circumstances.

76.     Accordingly, prudent and unconflicted fiduciaries should put in place and conduct an appropriate process to continuously monitor and control a 401(k) plan's administrative costs. As part of that process, fiduciaries should continuously pay close attention to the administrative

---

[16]     *Study of 401k Plan Fees and Expenses*, at 4.2.2 (Apr.13, 1998) (https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf).

[17]     *See id*. ("[b]asic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases.").

fees being paid by the plan. Among other things, a prudent fiduciary can track the service provider's expenses by seeking documents that summarize and contextualize that provider's compensation, such as the plan's fee transparency reports, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

77. Additionally, in order to make an informed determination as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, prudent fiduciaries should identify and track all fees, including any direct compensation and revenue sharing being paid to the plan's service providers. Prudent fiduciaries should further monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources (including, as here, asset-based revenue sharing from the brokerage window) does not exceed reasonable levels.

78. Furthermore, in order to fulfill their fiduciary duty to continually monitor administrative expenses to ensure their reasonableness, a plan's fiduciaries should remain informed about the overall trends in the marketplace regarding the fees being paid by other plans, as well as the available rates for administrative services. This aspect of their fiduciary responsibilities will generally entail conducting a Request for Proposal ("RFP") at reasonable intervals, or immediately at any given point in time, if the plan's administrative expenses appear high in relation to the general marketplace.[18]

---

[18]    *See George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (noting opinion of independent consultant in similar case "without an actual fee quote comparison' – *i.e.*, a bid from another service provider – [consultant] 'could not comment on the competitiveness of [recordkeeper's] fee amount for the services provided.'").

79.     Defendants breached their duty to prudently and loyally monitor and control the Plan's administrative costs by failing to undertake any of the aforementioned measures and acting to further the Company's own interests as opposed to those of the Plan.  Here, among other things, there is no indication that Defendants conducted a proper bidding process or engaged in appropriate negotiations to lower the administrative costs during the Relevant Period. Additionally, Defendants failed to ensure that the fees paid to the service providers, including through the revenue-sharing arrangements, did not exceed reasonable levels, or unduly profit the Company or other parties in interest.  Likewise, Defendants failed to monitor the appropriateness of the redemption fees, sales commissions, and other similar expenses in connection with transactions associated with the Plan's investment options.   As such, the total amount of administrative fees paid in connection with the Plan throughout the Relevant Period was unreasonable and imprudent, and contrary to the Plan's best interests.

80.     Here, as alleged above, the Plan had 23,270 Participants at the end of the 2019 Plan year, with total assets valued at approximately $4.493 billion as of December 31, 2019.  As such, the Plan is endowed with a significant bargaining power, given the numerosity of its participants, as well as its substantial assets.  Yet, Defendants failed to conduct a proper competitive bidding process concerning the Plan's recordkeeping arrangement despite their ability to negotiate reasonable and low-cost administrative fees for the Plan, including the recordkeeping fees.

81.     According to the SPD, Fidelity Investments Inc. ("Fidelity") has served as the Plan's recordkeeper throughout the Relevant Period.  Pursuant to the Plan's 2021 Participant Disclosure Notice, the recordkeeping and other administrative fees amount to $66 per participant. Due to the Plan's strong bargaining power, and the availability of comparable or superior administrative service options in the marketplace at a lower cost, there was no reason for the Plan

to pay such a high administrative fee, thereby significantly reducing the Participants' retirement savings.

82.     By way of example, according to Fidelity itself, a standard recordkeeping fee for a plan with the same asset and participant size should be around $14-$21 per participant. Specifically, in another action challenging Fidelity's recordkeeping fees, Fidelity stipulated that if it were a third party, the value of its recordkeeping services for a plan of over 1 billion dollars in assets, such as the Plan here, would range from $14-$21 per person per year.[19]  By way of further example, according to *401k Averages Book*,[20] the average recordkeeping/administrative fee through direct compensation, based on data compiled in 2019, was $5 per participant for plans with just 2,000 participants and $200 million in assets (a fraction of the number of Participants and assets held by the Plan).  *See id.*, Pension Data Source, Inc. at 107, Chart 24.5 (Range of Per Participant Costs (20th ed. 2020) (data updated through September 30, 2019)).

83.     There is no indication that the Plan receives any administrative services, including recordkeeping services, beyond those that are typically provided by Fidelity and other 401(k) service providers to comparable retirement plans.[21]  Likewise, there is no indication that the value of the administrative services provided to the Plan is any different than the value of such services provided to any other plan of comparable size.  Here, the administrative fees, including the

---

[19]     *Moitoso v. FMR LLC*, 451 F.Supp.3d 189, 214 (D. Mass. 2020).

[20]     According to 401ksource.com, *401k Averages Book*, published since 1995, is the oldest, most recognized source for non-biased, comparative 401(k) average cost information.  It is designed to provide financial services professionals and plan sponsors with essential comparative cost information needed to determine if their plan costs are above or below average.

[21]     According to the SPD, the Plan incurs expenses for recordkeeping, trustee, auditor, legal, consulting and other necessary services for administration, which may include preparation of employee communications, proxy materials, related legal fees and audit fees.

recordkeeping fees paid by the Plan during the Relevant Period, have been unreasonable and unwarranted, as they are well above the standard rates for large plans such as the Plan.

84.     Specifically, the Plan's direct recordkeeping costs were well above the $5 average for plans a fraction of the size of the Plan.  Additionally, on top of direct compensation, Participants have incurred further administrative costs in the form of revenue sharing throughout the Relevant Period.  The exact amount of that indirect compensation for recordkeeping services cannot be ascertained based on publicly available information, given that revenue sharing is divided among all the Plan's service providers which "could include but are not limited to recordkeepers, advisors and platform providers." *401(k) Averages Book* at 7.  Moreover, according to the Plan's 2021 Participant Disclosure Notice, throughout the Relevant Period, the Plan's investments have been subject to unspecified redemption fees, commissions, and similar expenses in connection with transactions associated with the Plan's investment options.

85.     In light of, *inter alia*, Fidelity's own acknowledgment that the recordkeeping services should have been available to a plan of such size as the Plan for a significantly lower cost, Participants would have paid much less in recordkeeping and other administrative fees during the Relevant Period were it not for the Defendants' lack of monitoring.  Given the size of the Plan's assets during the Relevant Period and the number of its Participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained comparable or superior recordkeeping services (from Fidelity itself or from another provider) at a much lower cost.  Specifically, Defendants' failure to continually monitor and negotiate the Plan's administrative costs, including the recordkeeping fees, has cost Participants over $5.4 million in fees out of their retirement accounts.  A prudent fiduciary would have

leveraged the size of this jumbo plan to negotiate lower administrative fees for their participants annually.

F.  **DEFENDANTS' BREACHES OF DUTY CAUSED MILLIONS OF DOLLARS IN LOSSES TO THE PLAN AND ITS PARTICIPANTS**

86.     The rampant conflicts of interest and breaches of the duty of loyalty described above violate ERISA and mandate disgorgement of fees and other profits wrongfully obtained directly or indirectly, as a result of the Defendants' fiduciary breaches and violations of prohibited transactions during the Relevant Period, even if the Plan and Participants had not suffered investment losses.  But the Plan and Participants did suffer such losses.

87.     Due to the State Street Funds' poor performance, the Plan has suffered millions of dollars a year in losses during the Relevant Period because Defendants failed to remove or replace the State Street Funds as Plan investment options, thereby causing the Plan to invest billions of dollars in the State Street Funds.  This directly resulted in over $615 million of fees and other revenue for State Street[22] and improperly low investment returns for the Plan.

88.     Throughout the Relevant Period, Defendants did not consider or act in the best interest of the Plan and its Participants.  Rather, Defendants put their own interests before those of their fiduciary wards by treating the Plan's investments as a means not only to generate unreasonable fees, but also to prop up the Company's underperforming proprietary investment management business  (which, *inter alia*, was losing other 401(k) investors and trailing far behind its competitors, such as Vanguard[23] while Defendants were imprudently and disloyally keeping

---

[22]     The total amount of operating expenses State Street took in from only its own workers' investments in the State Street Funds through the Plan from 2015-2019, based on public information is approximately $615 million.

[23]     For example, the Plan is only one of 14 plans with over $1 billion in assets that have any State Street Target Retirement Funds in their plans.  By comparison, State Street's competitor and

the Plan invested in State Street's proprietary funds), and bolster the Company's business outlook and reputation.

89.     Thus, instead of acting in the Participants' best interests, Defendants' conduct and decisions were driven by their desire to drive revenues and profits to State Street and to generally promote State Street's business interests to the detriment of the Plan and its Participants. Defendants accomplished this by loading the Plan with State Street Funds, despite the fact that Participants would have been better served by being able to choose less expensive and better performing investment options managed by unaffiliated companies, that were readily available to the Plan, with its significant bargaining power, at all relevant times.

90.     Yet in addition to enabling State Street to earn exorbitant multi-million-dollar fees, Defendants' self-serving conduct enabled the Company to build up its investment management business, thereby increasing its visibility and improving its prospects in the asset management marketplace, ultimately bolstering the Company's bottom-line, market value, and business opportunities at the expense and to the detriment of the Plan.  In effect, Participants (and their hard-earned retirement investments) were used as a captive investor base to effectuate State Street's self-serving business strategies that ran counter to the Participants' interests.  As a result of Defendants' blatant self-dealing, the Plan-related investment decisions undertaken by Defendants during the Relevant Period, or their failure to act to protect the Plan, were imprudent and disloyal, and furthermore resulted in prohibited transactions under ERISA.  Through their actions and omissions, Defendants breached their ERISA mandated duties, and dealt with

---

a superior target date fund provider, Vanguard, boasts over 175 retirement plans with over $1 billion in plan assets that have the Vanguard target date funds in their plans.

Participants on a less favorable basis than other shareholders, by, among other things, offering other investors less expensive shares of the Company's proprietary funds.

91.     The damages suffered by the Plan due to its above-described, imprudent investment in State Street Target Retirement Funds alone amount to millions of dollars over the Relevant Period, as compared to, for instance, low-cost, better-performing Vanguard target date funds.

92.     Furthermore, the imprudent selection of the Money Market Fund over, for instance, the Vanguard Stable Value Mutual Fund cost Participants almost $8 million in lost earnings during the Relevant Period.  And had Defendants chosen the Vanguard Retirement Savings Collective Investment Trust, Participants would have gained over $13 million in their retirement accounts.

93.     Collectively, the underperformance of the State Street Funds *other than* the Target Retirement Funds and the Money Market Fund cost Participants over $8 million in earnings during the Relevant Period.

## V.     PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND RELATED FACTS UNTIL SHORTLY BEFORE FILING THIS COMPLAINT

94.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment option and recordkeeping services selections of fiduciaries of similar plans, the costs of the Plan's investments compared to those of similarly sized plans, the availability of superior investment options, or the costs of the Plan's administrative and recordkeeping services compared to similarly sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed via the investigation of their counsel.  Further, Plaintiffs did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting, monitoring, evaluating, and removing Plan investments; and Defendants' processes for selecting and monitoring the Plan's service providers),

because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## VI.   ERISA'S FIDUCIARY STANDARDS AND PROHIBITED TRANSACTIONS

95.   ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. ERISA §404(a), 29 U.S.C.§1104(a), states, in relevant part, that:

> [A] Fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)   for the exclusive purpose of
>
>> (i)      providing benefits to participants and their beneficiaries; and
>>
>> (ii)     defraying reasonable expenses of administering the plan;
>
> (B)   with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;
>
> (C)   by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D)   in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

96.   ERISA also imposes explicit co-fiduciary duties on plan fiduciaries. ERISA §405, 29 U.S.C. §1105, states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)   if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2)    if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

97.    Under ERISA, fiduciaries that exercise discretionary authority or control over the selection of plan investments and the selection of plan service providers must act prudently and solely in the interest of participants in the plan when selecting investments and retaining service providers.  As the Department of Labor explains:

> [T]o act prudently, a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of alternative investments for his or her plan.  [Where an investment], if implemented, causes the Plan to forego other investment opportunities, such investments would not be prudent if they provided a plan with less return, in comparison to risk, than comparable investments available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.

DoL Ad. Op. No. 88-16A.

98.    Pursuant to these duties, fiduciaries must ensure that the services provided to the plan are necessary and that the fees are reasonable:

> Under section 404(a)(1) of ERISA, the responsible Plan fiduciaries must act prudently and solely in the interest of the Plan participants and beneficiaries both in deciding . . . which investment options to utilize or make available to Plan participants or beneficiaries. In this regard, the responsible Plan fiduciaries must assure that the compensation paid directly or indirectly by the Plan to [service providers] is reasonable.

DoL Ad. Op. 97-15A; DoL Ad. Op. 97-16A.

99.    A fiduciary's duty of loyalty requires a fiduciary to act solely in the interest of plan participants and beneficiaries.  As the Department of Labor has repeatedly warned:

> We have construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to, participants and beneficiaries as prohibiting a fiduciary from subordinating the interests of participants and

beneficiaries in their retirement income to unrelated objectives.  Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income.  A decision to make an investment may not be influenced by [other] factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan.

DoL Ad. Op. No. 98-04A; DoL Ad. Op. No. 88-16A.

100.    The Department of Labor counsels that fiduciaries are responsible for ensuring that a plan pays reasonable fees and expenses and that fiduciaries need to carefully evaluate differences in fees and services between prospective service providers:

While the law does not specify a permissible level of fees, it does require that fees charged to a plan be "reasonable."  After careful evaluation during the initial selection, the plan's fees and expenses should be monitored to determine whether they continue to be reasonable.

In comparing estimates from prospective service providers, ask which services are covered for the estimated fees and which are not.  Some providers offer a number of services for one fee, sometimes referred to as a "bundled" services arrangement.  Others charge separately for individual services.  Compare all services to be provided with the total cost for each provider.  Consider whether the estimate includes services you did not specify or want. Remember, all services have costs.

Some service providers may receive additional fees from investment vehicles, such as mutual funds, that may be offered under an employer's plan.  For example, mutual funds often charge fees to pay brokers and other salespersons for promoting the fund and providing other services.  There also may be sales and other related charges for investments offered by a service provider.  Employers should ask prospective providers for a detailed explanation of all fees associated with their investment options.

*Meeting Your Fiduciary Responsibilities* (May 2004) (https://web.archive.org/web/20040603062416/http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html) (last viewed May 24, 2021).

101.    In a separate publication, the Department of Labor writes:

Plan fees and expenses are important considerations for all types of retirement plans.  As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's

participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

* * *

By far the largest component of plan fees and expenses is associated with managing plan investments. Fees for investment management and other related services generally are assessed as a percentage of assets invested. Employers should pay attention to these fees. They are paid in the form of an indirect charge against the participant's account or the plan because they are deducted directly from investment returns. Net total return is the return after these fees have been deducted. For this reason, these fees, which are not specifically identified on statements of investments, may not be immediately apparent to employers.

*Understanding Retirement Plan Fees and Expenses* (May 2004) (https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf).

102.    A fiduciary's duties of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA §404(a)(1)(D), 29 U.S.C. §1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by plan documents to do so.

103.    ERISA prohibits certain transactions with plans involving parties in interest and fiduciaries because of their significant potential for and risk of abuse. Specifically, ERISA §406 provides as follows:

(a) Transactions between plan and party in interest.

Except as provided in section 1108 of this title:

47

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107 (a) of this title.

(2) No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates section 1107 (a) of this title.

(b) Transactions between plan and fiduciary.

A fiduciary with respect to a plan shall not –

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

## VII.   **CLASS ALLEGATIONS**

104.   Plaintiffs bring this action on behalf of a proposed class defined as:

> All Participants who invested in the Plan from May 25, 2015 to the present. Excluded from the class are Defendants, Defendants' beneficiaries, and Defendants' immediate families.

105.    Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1), (b)(2), and/or (b)(3).

106.    The class satisfies the numerosity requirement because it is composed of thousands of persons, in numerous locations.  The Plan had 23,270 Participants at the end of the 2019 plan year, all of whom invested in the Plan during the Relevant Time Period.  The number of class members is so large that joinder of all its members is impracticable.

107.    Common questions of law and fact include:

A.  Whether Defendants failed to engage in a proper selection and monitoring process with regard to the Plan investments;

B.  whether Defendants improperly caused the Plan to invest its assets in imprudent funds to the exclusion of other available alternatives;

C.  whether Defendants breached their fiduciary duties to the Plan by causing the Plan to invest its assets in imprudent funds;

D.  whether the investment decisions made by Defendants were the result of their failure to make those decisions free of any conflicts and solely in the interests of Participants;

E.  whether Defendants breached their fiduciary duties to the Plan by not properly reviewing the Plan's administrative fees; and

F.  whether the Plan suffered losses as a result of Defendants' fiduciary breaches and prohibited transactions, and if so, the amount of those losses, or undue profits to be disgorged as a result of the fiduciary misconduct alleged herein.

49

108.    Plaintiffs' claims are typical of the claims of the class.  Plaintiffs have no interests that are antagonistic to the claims of the class.  Plaintiffs understand that this matter cannot be settled without the Court's approval.  Plaintiffs are not aware of another suit pending against Defendants arising from the same circumstances.

109.    Plaintiffs will fairly and adequately protect the interests of the class.  Plaintiffs are committed to the vigorous representation of the class.  Plaintiffs' counsel are experienced in class action and ERISA litigation.

110.    A class action is the superior method for the fair and efficient adjudication of this controversy.  Joinder of all members of the class is impracticable.  The losses suffered by some of the individual members of the class may be small, and it would therefore be impracticable for individual members to bear the expense and burden of individual litigation to enforce their rights.  Moreover, Defendants, as fiduciaries of the Plan, were obligated to treat all class members similarly as Participants pursuant to written plan documents and ERISA, which impose uniform standards of conduct on fiduciaries.  Individual proceedings, therefore, would pose the risk of inconsistent adjudications.  Plaintiffs are unaware of any difficulty in the management of this action as a class action.

111.    This Class may be certified under Rule 23(b).

A.    23(b)(1).  As an ERISA breach of fiduciary duty action, this action is a classic 23(b)(1) class action.  Prosecution of separate actions by individual members would create the risk of (A) inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for the defendants opposing the class, or (B) adjudications with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of the other

members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

B.    23(b)(2).  This action is suitable as a class action under 23(b)(2) because the Defendants have acted or refused to act on grounds generally applicable to the class as a whole, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the class.

C.    23(b)(3).  This action is suitable to proceed as a class action under 23(b)(3) because questions of law and fact common to the members of the class predominate over individual questions, and this class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

## VIII.  CLAIMS FOR RELIEF

### COUNT I
### BREACH OF DUTIES OF PRUDENCE AND LOYALTY
### AGAINST ALL DEFENDANTS
### (Violation of 29 U.S.C. §1104(a)(1)(A)–(B))

112.    As alleged above, Defendants are fiduciaries with respect to the Plan and are subject to ERISA's fiduciary duties.

113.    29 U.S.C. §1104 imposes fiduciary duties of prudence and loyalty upon Defendants in connection with their administration of the Plan and the selection and monitoring of Plan investments.

114.    Defendants breached these fiduciary duties by engaging in the conduct described herein.  Among other things, Defendants failed to employ a prudent and loyal process for selecting

and monitoring the Plan's investment options by improperly prioritizing State Street's proprietary investments over superior available options, and by failing to critically or objectively evaluate the cost and performance of the Plan's proprietary investments in comparison to other investment options. In addition, Defendants failed to consider the appropriateness of retaining a poorly performing money market fund, and replace it with a suitable alternative. Defendants further caused the Plan to pay unreasonable administrative fees, and failed to properly monitor and control those expenses, or ensure that their fiduciary decision-making was not tainted by conflicts of interest.

115.    Instead of acting in the best interests of Participants, Defendants' conduct and decisions were driven by their desire to drive revenues and profits to State Street and to generally promote State Street's business interests. Accordingly, Defendants failed to discharge their duties with respect to the Plan solely in the Participants' interests, and for the exclusive purpose of providing benefits to Participants and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. §1104(a)(1)(A).

116.    Further, each of the actions and omissions described above and elsewhere in this Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. §1104(a)(1)(B).

117.    As a consequence of Defendants' fiduciary breaches, the Plan and its Participants suffered millions of dollars in losses during the Relevant Period.

118.    Defendants are liable under 29 U.S.C. §§1109(a), 1132(a)(2), and 1132(a)(3), to make good to the Plan all losses resulting from the aforementioned fiduciary breaches, to restore

to the Plan any unjust profits obtained through the use of Plan assets, and shall be subject to such other equitable or remedial relief as the Court may deem appropriate.

## COUNT II
### BREACH OF DUTY TO MONITOR FIDUCIARIES
### AGAINST DEFENDANT STATE STREET

119.    As alleged throughout the Complaint, Defendant State Street is a fiduciary of the Plan pursuant to 29 U.S.C. §1002(21).

120.    Given that Defendant State Street has overall oversight responsibility for the Plan, and the specific responsibility to appoint and remove members of the Benefits Committee, State Street has a fiduciary responsibility to monitor the performance of the Benefits Committee and its members, and to ensure that they are complying with ERISA's statutory standards.  29 C.F.R. §2509.75-8 (FR-17).   Likewise, State Street has a fiduciary responsibility to monitor the performance of the Investment Committee and its members, and to ensure that they are also complying with ERISA.  *Id.*  Similarly State Street has a fiduciary responsibility to monitor the performance of State Street Bank, and to ensure that it complies with the statute.

121.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and its participants when the monitored fiduciaries are not meeting their fiduciary obligations.

122.    To the extent that Defendant State Street's fiduciary monitoring responsibilities were delegated, this monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

123.    Defendant State Street breached its fiduciary monitoring duties by, among other things:

a.      failing to monitor and evaluate the performance of State Street Bank, the Benefits Committee, and the Investment Committee, or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Defendants' imprudent actions and omissions with respect to the Plan;

b.      failing to monitor the fiduciary processes of State Street Bank, the Benefits Committee, and the Investment Committee, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein; and

c.      failing to remove members of the Benefits Committee or the Investment Committee, or employees of the Plan trustee, whose performance was inadequate in that they continued to maintain imprudent and poorly performing investments within the Plan, continuing to cause the Plan to pay excessive administrative expenses, and engaging in transactions prohibited under ERISA, all to the detriment of the Plan and Participants' retirement savings.

124.    As a consequence of the foregoing breaches of the duty to monitor, the Plan and its Participants suffered millions of dollars of losses during the Relevant Period due to unreasonable fees and investment underperformance.

125.    Pursuant to 29 U.S.C. §§1109(a), 1132(a)(2), and 1132(a)(3), Defendant State Street is liable to restore to the Plan all losses suffered as a result of its failure to properly monitor other Plan fiduciaries as set forth herein, to restore to the Plan any unjust profits obtained through the use of Plan assets, and shall be subject to such other equitable or remedial relief as the Court may deem appropriate.

**<u>COUNT III</u>**
**PROHIBITED TRANSACTIONS WITH A PARTY IN INTEREST**
**AGAINST ALL DEFENDANTS**
**(Violation of §406(a)(1) of ERISA, 29 U.S.C. §1106(a)(1))**

126.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

127.    As the Plan sponsor, the corporate parent of the trustee, and a service provider for the Plan, State Street (including its subsidiaries) is a party in interest under ERISA §3(14), 29 U.S.C. §1002(14).

128.    As the Plan trustee, State Street Bank is a party in interest under ERISA §3(14), 29 U.S.C. §1002(14).

129.    As the Plan recordkeeper, Fidelity (including its subsidiaries) is a party in interest under ERISA §3(14), 29 U.S.C. §1002(14).

130.    Under ERISA §406(a)(1)(C), 29 U.S.C. §1106(a)(1)(C), a fiduciary shall not cause a plan to engage in a transaction, if the fiduciary knows or should know that such transaction constitutes a direct or indirect furnishing of services between the plan and a party in interest.

131.    Under ERISA §406(a)(1)(D), 29 U.S.C. §1106(a)(1)(D), a fiduciary shall not cause a plan to engage in a transaction, if the fiduciary knows or should know that such transaction constitutes a direct or indirect transfer to, or use by or for the benefit of, a party in interest of any assets of the plan.

132.    Here, in violation of §406(a)(1)(C)-(D), 29 U.S.C. §1106(a)(1)(C)-(D), Defendant-fiduciaries caused the Plan to offer and to continue offering proprietary State Street investment options that not only generated unreasonable fees that profited State Street and State Street Bank, both parties of interest *vis-à-vis* the Plan, but also enabled the Company to bolster its investment management business and seed that business with Plan assets, in furtherance of State Street's

55

corporate strategy and business opportunities, thereby further profiting the Company, as opposed to advancing the interests of the Plan. In further violation of these statutory prohibitions, Defendants caused the Plan to pay unreasonable fees to the Plan's recordkeeper, Fidelity, also a party in interest. By selecting and retaining State Street Funds, Defendants further caused the Plan to engage in transactions with parties in interest that were for more than reasonable compensation, were subject to redemption fees and sales commissions, and/or were on terms less favorable than those offered to other shareholders. Defendants caused the Plan to engage in these prohibited transactions even though they knew or should have known at all relevant times that such transactions constitute a direct or indirect furnishing of services between the Plan and parties in interest, and that such transactions constitute a direct or indirect transfer to, or use by or for the benefit of, the parties in interest of the assets of the Plan.

133. As alleged herein, during the Relevant Period, State Street and/or its subsidiaries (including State Street Bank) have served as the investment manager(s) or other service provider(s) for each of the State Street Funds. During the Relevant Period, Fidelity and/or its subsidiaries have served as the Plan's recordkeeper. At all relevant times, State Street and/or its subsidiaries (including State Street Bank) as well as Fidelity and/or its subsidiaries, have collected unreasonable compensation in the form of various direct or indirect fees from the Plan. In particular, State Street and/or its subsidiaries, as well as Fidelity and/or its subsidiaries, have deducted on a regular basis unreasonable fees from the Plan assets in return for the investment management services, or other services provided to the Plan, including but not limited to the administrative services.[24] In addition, throughout the Relevant Period, the Plan was subject to

---

[24] According to the SPD, the Plan processes a portion of the administrative fees through a basis point reduction against the Plan investment fund returns in the same way investment

redemption fees, commissions, and other similar expenses associated with its investments in State Street Funds.  Defendants caused the Plan to engage in these prohibited transactions even though they knew or should have known at all relevant times that such transactions constitute a direct or indirect furnishing of services between the Plan and parties in interest, and that such transactions constitute a direct or indirect transfer to, or use by or for the benefit of, the parties in interest of the assets of the Plan.

134.    Furthermore, during the Relevant Period, Defendant-fiduciaries caused the Plan to invest in State Street Funds to develop and sustain the Company's investment management business (including by using Plan assets as seed money for newly launched proprietary funds, and by using Plan assets to purchase more expensive shares of its funds than those purchased by other shareholders), even as other investors were exiting or decreasing their holdings in State Street Funds.  Defendants caused the Plan to engage in these prohibited transactions even though they knew or should have known at all relevant times that such transactions constitute a direct or indirect transfer to, or use by or for the benefit of, the parties in interest of the assets of the Plan.

135.    As detailed above, Defendants maintained numerous State Street Funds in the Plan during the Relevant Period, thus causing the Plan to engage in multiple prohibited transactions.

136.    As a direct and proximate result of these prohibited transaction violations, the Plan directly or indirectly paid millions of dollars in unreasonable investment management fees, and other unreasonable fees and expenses, thereby resulting in millions of dollars in losses to the Plan and its Participants, and/or unjust profits for the benefit of the parties in interest, earned not only through the receipt and collection of the fees stemming from the Plan's proprietary investments,

---

management fees and investment management operating expenses are charged against the Plan investment funds.  Further, as alleged above, the Plan's administrative fees are subject to a revenue-sharing arrangement with Fidelity.

but also through the use of Plan assets invested in State Street Funds to develop and sustain the Company's investment management business during the Relevant Period.

137.    Pursuant to 29 U.S.C. §§1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all the unjust profits obtained in violation of 29 U.S.C. §1106(a)(1), and shall be subject to such other equitable or remedial relief as the Court may deem appropriate.

### COUNT IV
#### PROHIBITED TRANSACTIONS WITH FIDUCIARIES
#### AGAINST ALL DEFENDANTS
#### (Violation of §406(b) of ERISA, 29 U.S.C. §1106(b))

138.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

139.    As alleged herein, State Street is a fiduciary of the Plan within the meaning of 29 U.S.C. §1002(21) and §1106(b)(1).

140.    As alleged herein, State Street Bank is a fiduciary of the Plan within the meaning of 29 U.S.C. §1002(21) and §1106(b)(1).

141.    As alleged herein, the Defendant Benefit and Investment Committees and their respective members are fiduciaries of the Plan within the meaning of 29 U.S.C. §1002(21) and §1106(b)(1).

142.    Under ERISA §406(b)(1), 29 U.S.C. §1106(b)(1), a fiduciary shall not deal with the assets of the plan in its own interest or for its own account.

143.    Under ERISA §406(b)(2), 29 U.S.C. §1106(b)(2), a fiduciary shall not in its individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants and beneficiaries.

144.     Under ERISA §406(b)(3), 29 U.S.C. §1106(b)(3), a fiduciary shall not receive any consideration for his personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

145.     Throughout the Relevant Period, State Street dealt with the assets of the Plan in its own interest when it not only caused the Plan to pay unreasonable direct or indirect fees to the Company or its subsidiaries, but also profited from the development of its investment management business due to the Plan's investment in State Street Funds, including the Plan assets used to seed the Company's untested proprietary funds and the Plan assets used to purchase the more expensive shares of the Company's proprietary funds than were offered to non-Plan investors, in violation of 29 U.S.C. §1106(b)(1).

146.     Throughout the Relevant Period, State Street Bank dealt with the assets of the Plan in its own interest when it not only caused the Plan to pay unreasonable direct or indirect fees to itself or to its corporate parent State Street, but also profited from the development of the Company's investment management business due to the Plan's investment in State Street Funds, including the Plan assets used to seed the Company's untested proprietary funds and the Plan assets used to purchase the more expensive shares of the Company's proprietary funds than were offered to non-Plan investors, in violation of 29 U.S.C. §1106(b)(1).

147.     Throughout the Relevant Period, the Benefit and Investment Committee Defendants dealt with the assets of the Plan in their own interest when they caused the Plan to pay unreasonable direct or indirect fees to the Company or its subsidiaries and used the Plan to develop the Company's investment management business due to the Plan's investment in State Street Funds, including the Plan assets used to seed the Company's untested proprietary funds and the Plan assets used to purchase the more expensive shares of the Company's proprietary funds than

were offered to non-Plan investors, in violation of 29 U.S.C. §1106(b)(1).  Upon information and belief, every member of the Benefit and Investment Committees was a State Street executive, whose compensation and promotion levels increased when they acted to increase revenue for the Company and to bring about further business opportunities for the Company.

148.    Throughout the Relevant Period, Defendants named in this Count, acting on behalf of the Company, whose corporate interests were adverse to those of the Plan and its Participants, in transactions involving the Plan, violated 29 U.S.C. §1106(b)(2), by causing the Plan to offer and maintain State Street Funds that not only generated unreasonable revenue for the Company or its subsidiaries, but also enabled the Company to develop and sustain its investment management business in furtherance of its business ventures and opportunities to the detriment of the Plan and its Participants.

149.    Throughout the Relevant Period, State Street received and collected consideration for its own account in connection with the transactions involving the assets of the Plan in violation of 29 U.S.C. §1106(b)(3).  These transactions took place on a periodic basis throughout the Relevant Period when unreasonable fees were received and collected in return for the investment management services, or other services provided to the Plan, including but not limited to the administrative services provided to the Plan.  Additionally, these transactions took place during the Relevant Period, via the redemption fees, commissions, and other similar expenses associated with the Plan's investments in State Street Funds.

150.    Throughout the Relevant Period, State Street Bank received and collected consideration for its own account or for the account of its corporate parent, State Street, in connection with the transactions involving the assets of the Plan, in violation of 29 U.S.C. §1106(b)(3).  These transactions took place on a periodic basis throughout the Relevant Period

when unreasonable fees were received and collected in return for the investment management services, or other services provided to the Plan, including but not limited to the administrative services provided to the Plan. Additionally, these transactions took place during the Relevant Period, via the redemption fees, commissions, and other similar expenses associated with the Plan's investments in State Street Funds.

151. Based on the foregoing facts, Defendants, each a fiduciary of the Plan, violated 29 U.S.C. §1106(b). These prohibited transactions took place on an ongoing basis throughout the Relevant Period when State Street or its subsidiaries repeatedly received and collected unreasonable fees from the Plan, all the while also reaping unjust profits from the development of State Street's investment management business due to the inclusion of the State Street Funds in the Plan.

152. As a direct and proximate result of these prohibited transaction violations, the Plan directly or indirectly paid unreasonable fees and expenses, in connection with transactions that were prohibited under ERISA, resulting in significant losses to the Plan and its Participants, and/or unjust profits to the Plan fiduciaries.

153. Pursuant to 29 U.S.C. §§1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all the unjust profits obtained in violation of 29 U.S.C. §1106(b), and shall be subject to such other equitable or remedial relief as the Court may deem appropriate.

### COUNT V
#### CO-FIDUCIARY LIABILITY
#### AGAINST ALL DEFENDANTS
#### (Violation of §405(a) of ERISA, 29 U.S.C. §1105(a))

154. Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

155.    ERISA §405(a), 29 U.S.C. §1105(a), imposes liability on a fiduciary, in addition to any liability, which it may have under any other provision of ERISA, if:

      1)  it participates knowingly in or knowingly undertakes to conceal an act or omission of such other fiduciary knowing such act or omission is a breach;

      2)  by its failure to comply with ERISA §404(a)(1) in the administration of its specific responsibilities which give rise to its status as a fiduciary, it has enabled such other fiduciary to commit a breach; or

      3)  it knows of a breach by another fiduciary and fails to make reasonable efforts to remedy the breach.

156.    Defendants were all fiduciaries of the Plan within the meaning of ERISA §405(a), 29 U.S.C. §1105(a).

157.    Each Defendant knew of each breach of fiduciary duty by the other Defendants alleged herein, arising out of the imprudent and disloyal management of the Plan's investments and the prohibited transaction violations that took place during the Relevant Period. Yet, Defendants knowingly participated in these fiduciary breaches and prohibited transactions, breached their own duties, thereby enabling other fiduciary breaches and prohibited transactions, and/or took no steps to remedy such other fiduciary breaches and prohibited transactions.

158.    As some, if not all of the members of the Benefits Committee and the Investment Committee were officers, directors, or employees of Defendants State Street and/or State Street Bank, their knowledge is imputed to Defendants State Street and/or State Street Bank. The knowledge of State Street Bank's employees is also imputed to State Street Bank and/or its corporate parent, State Street. Defendant State Street knew of the breaches of fiduciary duty and prohibited transactions by each of the other Defendants arising out of the imprudent and disloyal

management of the Plan's investments and the prohibited transaction violations that took place during the Relevant Period.  Yet, Defendant State Street knowingly participated in these fiduciary breaches and prohibited transactions, breached its own duties to the Plan, thereby enabling other fiduciary breaches and prohibited transactions, and/or took no steps to remedy these fiduciary breaches and prohibited transactions.

159.    As a direct and proximate result of these co-fiduciary violations by Defendants, the Plan and its Participants suffered millions of dollars in losses during the Relevant Period.

160.    Defendants are liable under 29 U.S.C. §§1109(a), 1132(a)(2), and 1132(a)(3), to make good to the Plan all losses resulting from the aforementioned co-fiduciary violations and restore to the Plan any unjust profits obtained through the use of Plan assets and shall be subject to such other equitable or remedial relief as the Court may deem appropriate.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.    A declaration that the Defendants breached their fiduciary duties of prudence and loyalty under ERISA;

B.    A declaration that State Street breached its fiduciary duty to monitor under ERISA;

C.    A declaration that the Defendants violated ERISA §406 and participated in prohibited transactions;

D.    An order compelling the disgorgement of all unjust profits incurred, directly or indirectly, as a result of the Defendants' violations of ERISA;

E.    An order compelling the Defendants to restore all losses to the Plan arising from the Defendants' violations of ERISA;

F.    An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

G.      Such other equitable or remedial relief as may be appropriate, including the permanent removal of Defendants from any positions of trust with respect to the Plan, the appointment of independent fiduciaries to administer the Plan, and rescission of the Plan's investments in State Street Funds and any other imprudent investments;

H.      An order certifying this action as a class action, designating the class to receive the amounts restored or disgorged to the Plan, and imposing a constructive trust for distribution of those amounts to the extent required by law;

I.      An order enjoining Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

J.      An order awarding Plaintiffs and the class their attorneys' fees and costs pursuant to ERISA §502(g), 29 U.S.C. §1132(g) and/or the Common Fund doctrine; and

K.      An order awarding such other and further relief as the Court deems equitable and just.

Dated: May 25, 2021                         SCOTT+SCOTT ATTORNEYS AT LAW LLP

                                            /s/ Amanda F. Lawrence
                                            Amanda F. Lawrence (BBO#568737)
                                            156 South Main Street
                                            P.O. Box 192
                                            Colchester, CT 06415
                                            Telephone: 860-537-5537
                                            alawrence@scott-scott.com

                                            SCOTT+SCOTT ATTORNEYS AT LAW LLP
                                            Garrett W. Wotkyns
                                            8068 East Del Acero Drive
                                            Scottsdale, AZ 85258
                                            Telephone: 480-889-3514
                                            gwotkyns@scott-scott.com

SCOTT+SCOTT ATTORNEYS AT LAW LLP
Tanya Korkhov
The Helmsley Building
230 Park Ave., 17th Floor
New York, NY 10169
Telephone: 212-223-6444
tkorkhov@scott-scott.com

PEIFFER WOLF CARR KANE & CONWAY
A Professional Law Corporation
Joseph C. Peiffer
Daniel J. Carr
Kevin P. Conway
Jamie L. Falgout
1519 Robert C. Blakes Sr. Drive
New Orleans, LA 70130
Telephone: 504-523-2434
jpeiffer@peifferwolf.com
dcarr@peifferwolf.com
kconway@peifferwolf.com
jfalgout@peifferwolf.om

*Attorneys for Plaintiffs*